IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | |
| | § | Criminal Action No. 3:02-CR-52-L |
| BAYAN ELASHI, (1) | § | |
| GHASSAN ELASHI, (2) | § | |
| BASMAN ELASHI, (3) | § | |
| INFOCOM CORPORATION, (8) | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are the following postverdict motions:  (1) Rule 29(c) Renewal of Motion

of Judgment of Acquittal, filed by Defendant Ghassan Elashi on April 19, 2005; (2) Motion for

Judgment of Acquittal Pursuant to Rule 29, Federal Rules of Criminal Procedure, filed by Defendant

Basman Elashi on April 19, 2005; (3) Defendant Basman Elashi's Motion for New Trial Pursuant

to Rule 33, Federal Rules of Criminal Procedure, filed on April 19, 2005; and (4) Defendants'

Motion Reurging Motion for Judgment of Acquittal Pursuant to Rule 29, Federal Rules of Criminal

Procedure and Motion Adopting Other Defendants' Motions, filed by Defendants Bayan Elashi and

Infocom Corporation on May 13, 2005 (collectively referred to as "postverdict motions").  On

February 1, 2006, the court conducted a hearing concerning the post-verdict motions.  Upon careful

consideration of the motions, the record, and applicable law, for the reasons herein stated, the court

**denies** Defendant Ghassan Elashi's Rule 29(c) Renewal of Motion of Judgment of Acquittal; **denies**

Defendant Basman Elashi's Motion for Judgment of Acquittal Pursuant to Rule 29, Federal Rules

of Criminal Procedure; **denies** Defendant Basman Elashi's Motion for New Trial Pursuant to Rule

33, Federal Rules of Criminal Procedure; and **denies** Defendants' Motion Reurging Motion for

Judgment of Acquittal Pursuant to Rule 29, Federal Rules of Criminal Procedure and Motion Adopting Other Defendants' Motions, filed by Defendants Bayan Elashi and Infocom Corporation.

## I.  **Procedural and Factual Background**

This opinion addresses postverdict motions filed by the above-named Defendants in response to the jury verdict, returned April 13, 2005, regarding renumbered Counts 1 through 21 of the Revised Superseding Indictment ("revised superseding indictment"), filed April 14, 2005.[1] Defendants Bayan Elashi ("Bayan"), Ghassan Elashi ("Ghassan"), and Basman Elashi ("Basman"), are employees of Infocom Corporation[2] ("Infocom"), and are brothers.  Bayan is the President; Ghassan is Vice-President of Marketing; and Basman is the Logistics and Credit Manager.  The Elashi family owns 100% of Infocom's stock.

Renumbered Counts 1 through 21 center upon alleged violations of law relating to financial transactions between Infocom and Nadia Elashi ("Nadia"), a cousin of Defendants.  Nadia is married to Mousa Abu Marzook ("Marzook"), who is a leader in the Islamic Resistance Movement ("Hamas").  At trial, the Government contended that Defendants entered into an alleged scheme whereby they executed a contractual agreement with Nadia in order to conceal approximately $250,000 that Marzook had invested in Infocom, thereby creating the appearance that Nadia actually invested these monies.  Further, it contended that Defendants conspired to deal, and dealt, in the

---

[1]On April 20, 2004, the court severed Counts 1 through 25 of the August 21, 2003 superseding indictment from Counts 26 through 46.  On July 7, 2004, a jury returned a verdict concerning Counts 1 through 25, which charged the above named Defendants, as well as Defendants Hazim Elashi and Ihsan Elashyi, with various offenses.  The court sentenced Defendants Hazim Elashi and Ihsan Elashyi, charged only with Counts 1 through 25, on January 23-24, 2006.  On April 13, 2005, a jury returned a verdict concerning counts 26 through 46, which were renumbered as Counts 1 through 21 of the revised superseding indictment.

[2]Prior to the formation of Infocom, Defendants Bayan, Ghassan, and Basman Elashi worked and performed various functions at International Computers and Communications ("ICC"), a California corporation.  In 1992, ICC relocated to Texas, and the Defendants created Infocom, a Texas corporation.  An Infocom Executive Summary states that "In 1992, ICC moved to Texas . . . and was registered as InfoCom Corp."  Govt's Ex. 27B at 2.

property of Marzook after he received a terrorist designation; and that Defendants conspired to launder money, and laundered money, by using Infocom to make payments to Nadia during the years after the contractual agreement was executed, knowing that these monies represented the proceeds of unlawful activity, and structuring the payments to conceal the interest Marzook retained in the monies paid.

On March 22, 1993, Infocom and Nadia executed a "Murabaha Agreement," a contractual agreement, whereby Nadia agreed to pay $250,000 to Infocom "to be used in computer and trade business . . . ." Govt's Ex. 18 at 2.  By its terms, the Murabaha Agreement was "valid for 12 months and renewable upon the agreement of the two parties."  *Id.*  Defendant Bayan Elashi signed the agreement on behalf of Infocom; Nadia signed the agreement; and Marzook signed as a "Second Witness."  *Id.* at 3.

On January 23, 1995, under the authority of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 (the "IEEPA"), President William J. Clinton issued Executive Order 12947.  Executive Order 12947 specifies that, "notwithstanding any contract entered into . . . prior to the effective date," all property and interests in property of specially designated persons "that are in the United States . . . or that hereafter come within the possession or control of United States persons, are blocked . . . ."  Exec. Order 12947 § 1(a)(iii), 60 Fed. Reg. 5079 (Jan. 23, 1995).[3]  The Order further states that "any transaction or dealing by United States persons or within the United States in property or interests in property of the persons designated in or pursuant to this order is prohibited, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of such persons."  *Id.* § 1(b).  The IEEPA, the enforcement mechanism for Executive

---

[3]The term "interest," when used with respect to property, "means an interest of any nature whatsoever, direct or indirect."  31 C.F.R. § 595.307.

**Memorandum Opinion and Order - Page 3**

Order 12947, provides, "[w]hoever willfully violates . . . any license, order, or regulation issued under this chapter [shall be guilty of an offense.]" 50 U.S.C. § 1705(b).

As a result of Executive Order 12947, the Secretary of the Treasury promulgated regulations. One regulation provides:

> Except as authorized by [law], no property or interests in property of a specially designated terrorist, that are in the United States . . . or hereafter come within the possession or control of [United States] persons . . . may be transferred, paid, exported, withdrawn or otherwise dealt in.

31 C.F.R. § 595.201(a).[4]  Another regulation sets forth prohibited conduct:

> Any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions set forth in this part, is hereby prohibited.  Any attempt to violate the prohibitions set forth in this part is hereby prohibited.  Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is hereby prohibited.

31 C.F.R. § 595.205.  The regulations further provide, "[w]hoever willfully violates any license, order, or regulation issued under the Act [commits an offense against the United States.]" 31 C.F.R. § 595.701(a)(2).

On January 25, 1995, the Department of the Treasury, Office of Foreign Assets Control ("OFAC"), designated Hamas as a Specially Designated Terrorist Organization.  On August 29, 1995, OFAC designated Marzook as a Specially Designated Terrorist pursuant to Executive Order 12947 and the IEEPA.  According to the Government, this designation blocked as a matter of law any property in which Marzook held any interest that is subject to the jurisdiction of the United

---

[4]Similarly, another regulation provides:

> Except as otherwise authorized, no [United States] person may deal in property or interests in property of a specially designated terrorist, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of a specially designated terrorist.

31 C.F.R. § 595.204.

**Memorandum Opinion and Order - Page 4**

States.  *See* Rev. Supers. Indict. ¶ 11.  It alleged that, upon designation, any United States person or entity who possessed any funds in which Marzook held any interest should have reported such interest to the proper United States authorities.  *Id*.  The Government contended that Defendants' dealings in the $250,000 forming the basis of the Murabaha Agreement, and the proceeds therefrom, after Marzook received a terrorist designation, as well as their attempts to avoid acknowledgment of such monies, violated Executive Order 12947 and the IEEPA.

On July 25, 1995, Marzook was arrested at John F. Kennedy International Airport in Queens County, New York.  The Eastern District of New York issued a subpoena to the Custodian of Records of Infocom on July 28, 1995.  On July 31, 1995, FBI Special Agent Brian Harkins, among other agents, served the subpoena upon Infocom. On September 5, 2001, OFAC issued a Blocking Notice upon Bayan Elashi, as President of Infocom Corporation.  Federal agents searched Infocom, pursuant to an executed search warrant, on September 5 through 7, 2001, collecting materials in both hard copy and electronic form.  On September 24, 2001, Mr. Arch McColl, Infocom's then attorney, submitted a letter containing various attachments in response to OFAC's Blocking Notice.  Federal authorities arrested Defendants Bayan and Ghassan Elashi on December 18, 2002, and arrested Defendant Basman Elashi on December 19, 2002.

After the conclusion of trial for counts 1 through 25, Defendants were tried under the 21-count revised superseding indictment.  The charges included conspiracy to deal in the property of a Specially Designated Terrorist, 18 U.S.C. § 371, 50 U.S.C. §§ 1701-1706, and 31 C.F.R. §§ 595 *et seq*. (Count 1); dealing in the property of a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. §§ 595 *et seq*., and 18 U.S.C. § 2 (Count 2); substantive counts of dealing in the property of a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. §§ 595 *et seq*., and

18 U.S.C. § 2 (Counts 3 through 11); conspiracy to commit money laundering, 18 U.S.C. § 1956(h) (Count 12); and substantive counts of money laundering, 18 U.S.C. §§ 1956(a)(1)(B)(i), 2 (Counts 13 through 21).

On April 13, 2005, the jury returned its verdict, convicting Defendants Bayan Elashi, Ghassan Elashi, and Infocom on all counts, and convicting Defendant Basman Elashi on Counts 1, 2, and 12. The Defendants moved jointly for judgments of acquittal at the close of the Government's case-in-chief, and reurged the motions postverdict. The Government filed its Consolidated Response to Defendants' Motions for Judgment of Acquittal and New Trial on May 27, 2005. On February 1, 2006, the court held a hearing concerning the postverdict motions.

The parties acknowledge, as is evident, that this is a circumstantial evidence case. The Government contends that it presented evidence at trial which, when reviewed in the light most favorable to it, with all reasonable inferences drawn in support of the verdict, was sufficient for a reasonable jury to conclude that all of the essential elements of each crime were established beyond a reasonable doubt. Under the Government's theory of the case, Defendants executed the Murabaha Agreement as a prop or cover designed to document on paper that Nadia, and not Marzook, had invested the $250,000. It argued that Defendants continued their scheme by making false representations consistent therewith (a) during the response to the July 1995 subpoena, and (b) through the September 24, 2001 letter submitted by Arch McColl. Although each Defendant raises specific issues, all argue that the evidence presented is insufficient as a matter of law to support a guilty verdict on the respective counts of conviction.

## II.    Standards of Review

### A.    Motion for Judgment of Acquittal

A motion for judgment of acquittal "challenges the sufficiency of the evidence to convict." *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998) (citing Fed. R. Crim. P. 29(a)), *cert. denied*, 526 U.S. 1043 (1999). The standard of review for a motion for judgment of acquittal is whether, "reviewed in the light most favorable to the government, drawing all reasonable inferences in support of the verdict," "a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994). In other words, "[t]he only question is whether a rational jury could have found each essential element of the offense beyond a reasonable doubt." *Id.* The court does not assess the credibility of witnesses or weigh the evidence, since the jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001), *cert. denied*, 534 U.S. 1134 (2002); *see also United States v. Molinar-Apodaca*, 889 F.2d 1417, 1423 (5th Cir. 1989). If the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," then reversal is required. *Pennington*, 20 F.3d at 597. The jury "is free to choose among all reasonable constructions of the evidence," and "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001) (quotations and citations omitted).[5]

### B.    Motion for New Trial

---

[5]In ruling on Defendants' motions for judgment of acquittal, the evidence set forth by the court does not include all of the evidence that was admitted during trial; nor does the court discuss all of the reasonable inferences that could be drawn from the evidence that was presented. The court sets forth that amount of evidence sufficient to show that the legal standard for each Defendant's respective counts of conviction has been met.

A district court may grant motion for new trial if it is required in the interests of justice.  Fed. R. Crim. P. 33.  A motion for new trial is at "the discretion of the court, which should be exercised with caution, and the power to grant a new trial . . . should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997) (citation and quotation omitted).  During consideration of a motion for new trial, the court may weigh the evidence and assess the credibility of witnesses.  *Id.* at 1117 (citing *Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982)).  The court may not, however, "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable"; instead, for a motion for new trial to be granted, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1118 (citations omitted).

## III.   Applicable Law Controlling the Offenses of Conviction

### A.   Conspiracy

Count 1 of the revised superseding indictment alleged a single object conspiracy.  To establish conspiracy under 18 U.S.C. § 371, "the government must show (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001).  "Conspiracy may be proved through circumstantial evidence, and the agreement need not be formal or spoken." *United States v. Tencer*, 107 F.3d 1120,

1132 (5th Cir.), *cert. denied*, 522 U.S. 960 (1997).[6]  Proof of conspiracy "may be inferred from concert of action."  *Williams*, 264 F.3d at 577.  The object of the conspiracy, as specified in Count 1, was dealing in property in which Marzook, a Specially Designated Terrorist, had an interest.

### B.    Dealing in the Property of a Specially Designated Terrorist

Counts 2 through 11 charged the offense of dealing in the property of a Specially Designated Terrorist.  Count 2 alleged that Defendants, aided and abetted by each other, and by others, knowingly and willfully dealt in the property of Marzook, a Specially Designated Terrorist, by entering into and annually renewing the Murabaha Agreement, which related to monies in which Marzook had an interest.  Counts 3 through 11 alleged that Defendants, aided and abetted by each other, and by others, knowingly and willfully dealt in the property of Marzook, a Specially Designated Terrorist, by issuing, and causing to be issued, certain enumerated checks and wire transfers, involving property in which Marzook retained an interest, from the bank accounts of Infocom into bank accounts held under Nadia's name.[7]

---

[6]"[C]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."  *United States v. Salazar*, 958 F.2d 1285, 1294 (5th Cir.) (quotation and citations omitted), *cert. denied*, 506 U.S. 863 (1992).

[7]The court's jury instructions provided:

To establish a violation [of dealing in the property of a Specially Designated Terrorist], the Government must prove beyond a reasonable doubt each of the following elements as to each defendant:

First:    That the defendant himself or, by aiding and abetting another defendant or by being aided and abetted by another defendant, either transferred, paid, exported, withdrew or otherwise dealt in the property or interest in property of a specially designated terrorist;

Second:  That such property was in the United States . . . or thereafter came within the possession or control of United States persons; and

Third: That the defendant did so knowingly and willfully.

Ct's Instr. to Jury at 18.  To be convicted of aiding and abetting, a defendant must "have associated with the criminal venture, purposefully participated in it, and sought by his actions to make it succeed."  *United States v. Edwards*, 303 F.3d 606, 637 (5th Cir. 2002), *cert. denied*, 537 U.S. 1192 (2003).  An aider and abetter "is liable for criminal acts that are the natural or probable consequence of the crime that he counseled, commanded, or otherwise encouraged."  *Id.* (citation and quotation omitted).

**Memorandum Opinion and Order - Page 9**

### C.        Conspiracy to Commit Money Laundering

Count 12 charged the offense of conspiracy to commit money laundering.  It a crime for anyone to conspire to commit the offense of money laundering, as defined in Section 1956 of Title 18, United States Code.  18 U.S.C. § 1956(h).  The Government must "prove beyond a reasonable doubt that: (1) there was an agreement between two or more persons to launder money; (2) the defendant voluntarily agreed to join the conspiracy; and (3) one of the persons committed an overt act in furtherance of the conspiracy."  *United States v. Wilson*, 249 F.3d 366, 379 (5th Cir. 2001) (citing *United States v. Pettigrew*, 77 F.3d 1500, 1519 (5th Cir. 1996)).

### D.        Money Laundering

The money laundering counts, Counts 13 through 21, alleged violations of 18 U.S.C. §§ 1956(a)(1)(B)(i), 2.  Section 1956(a)(1)(B)(i) makes it a crime for anyone to knowingly use the proceeds of certain illegal activity to conceal or disguise the nature, location, source, ownership, or control of such proceeds.   To establish the offense of money laundering under section 1956(a)(1)(B)(i), the "government must prove that the defendant: (1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, and (3) which the defendant knew was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity."  *United States v. Burns*, 162 F.3d 840, 847 (5th Cir. 1998), *cert. denied*, 526 U.S. 1076 (1999).  Section 1956 requires that the financial transaction, in fact, involve funds derived from unlawful activity.  *Tencer*, 107 F.3d at 1130.  The specified unlawful activity in this case, as alleged in the revised superseding indictment, is dealing in the property of a Specially Designated Terrorist, as set forth in Count 2.  *See* Rev.

Supers. Indict. at 15; 18 U.S.C. § 1956(c)(7)(D).  The indictment alleged that each Defendant committed money laundering by issuing, or aiding and abetting the issuance of, checks and wire transfers from Infocom to Nadia, after Marzook received a terrorist designation, made pursuant to the conditions of the Murabaha Agreement, knowing that the property underlying the financial transactions represented the proceeds of monies in which Marzook had an interest, and also knowing that the transactions were designed in whole or in part to conceal the nature, source, ownership, or control of the proceeds.  *See* Rev. Supers. Indict. at 15.  "[T]he government must prove that the specific transactions in question were designed, at least in part, to launder money."  *United States v. Powers*, 168 F.3d 741, 747-48 (5th Cir.), *cert. denied*, 528 U.S. 945 (1999).  It must show "that the defendant desired to create the appearance of legitimate wealth or otherwise to conceal the nature of funds so that the money could enter the economy as legitimate funds."  *Id*. at 748 (citations omitted).  A "scheme that conceals only the source of the funds falls within the purview" of section 1956(a)(1)(B)(i)."  *Id*.

## IV.   Analysis

### A.   Ghassan Elashi's Motion for Judgment of Acquittal

Ghassan contends that the evidence is legally and factually insufficient to satisfy the Government's burden of proof as to each count, and asserts that, at best, its case is one of mere guilt by association.  While Ghassan makes a number of assertions regarding the insufficiency of the evidence, he does not always state with specificity the reasons that the evidence was insufficient on the counts for which he was convicted.[8]  Instead, Ghassan globally contends that the Government

---

[8]In tailoring arguments and citing evidence concerning the postverdict motions, Defendants and the Government did not always tailor their presentations toward particular counts of the revised superseding indictment, or to specific evidence or the lack thereof.  In some instances, the Government has painted with a broad brush, and Defendants have been far too conclusory.  The parties' approach has made the court's job excruciatingly painful and unnecessarily

presented no evidence, or insufficient evidence that: (1) he knew whether the $250,000 Infocom received by way of the Murabaha Agreement, purportedly from Nadia, were monies that Marzook had previously invested in Infocom or any predecessor; (2) Marzook had any interest in the payments Infocom sent to Nadia after Marzook was designated as a Specially Designated Terrorist on August 29, 1995; (3) he was involved in the accounting or financial matters of Infocom, other than participating in the execution of the Murabaha Agreement; (4) he participated in, or knew of, any financial decisions regarding whether Marzook retained any interest in payments Infocom made to Nadia subsequent to the Murabaha Agreement; (5) he committed any conduct, on or after August 29, 1995, evidencing that he knew Marzook retained any interest in such payments; and (6) he made, or knowingly participated in making, any false or misleading statement to any person, including any government official, as well as Arch McColl, concerning the nature or extent of Marzook's financial transactions with Infocom.

### 1. Dealing in the Property of a Specially Designated Terrorist

The court first turns to Counts 2 through 11, dealing in the property of a Specially Designated Terrorist. The pivotal question is whether Ghassan "willfully" violated Executive Order 12947 and the IEEPA.[9] "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'" *Bryan v. United States*, 524 U.S. 184, 191 (1998) (citations omitted). In order to establish a willful violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 192 (quoting *Ratzlaf v.*

---

extended.

[9]The court's jury instructions, which applied to all Defendants, provided that "willfully" "means the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids; that is to say, with the bad purpose either to disobey or disregard the law." *See* Ct's Instr. to Jury at 7.

**Memorandum Opinion and Order - Page 12**

*United States*, 510 U.S. 135, 137 (1994).  The issue of "willfulness" in relation to Executive Order

12947, as enforced under the IEEPA, is new to Fifth Circuit jurisprudence.  To establish a conviction

under the IEEPA for a willful violation of Executive Order 12947, the government must show that

the defendant acted with specific intent, that is, acted with knowledge that the conduct was unlawful

and therefore disregarded a known legal obligation.[10]  The pivotal inquiry is whether Ghassan knew

Marzook had any interest in the $250,000 related to the Murabaha Agreement after it was executed,

and specifically, on or after August 29, 1995, when Marzook received a terrorist designation, yet

willfully dealt in such property or property interest knowing such dealing was unlawful.

Ghassan contends that the evidence presented during trial does not support a reasonable

inference that he willfully dealt in the property of a Specially Designated Terrorist.  He asserts that

the Government presented insufficient evidence to establish that he knew the $250,000 invested in

Infocom pursuant to the Murabaha Agreement was Marzook's money, or that Marzook retained any

interest in the payments made by Infocom to Nadia in the years after the Murabaha Agreement was

---

[10]As contemplated by the court's jury instruction, the court believes the Fifth Circuit would hold that the Government establishes a willful violation of Executive Order 12947, as enforced under the IEEPA, by showing that Defendants knew specifically that dealing in property in which Marzook had any interest, on or after August 29, 1995, the date he received a terrorist designation, was unlawful, yet dealt in such property knowing they were breaking the law.  Previously, in *United States v. Dien Duc Huynh*, 246 F.3d 734, 742 (5th Cir. 2001), the court, in examining the willfulness requirement of the Trading With the Enemy Act ("TWEA"), 50 App. U.S.C. §16(a), held:

> The government . . . need not show that appellants had knowledge of the specific regulations governing transactions with Vietnamese nationals . . . . Rather, the government must prove only that the defendants knew that their planned conduct was legally prohibited and they therefore acted with an evil-meaning mind.

*Dien Duc Huynh*, 246 F.3d at 742 (internal citations and quotations omitted).  In reaching this decision, the court noted the similarity between the TWEA and the IEEPA.  *See id.* at 740 n.8.  Moreover, the court's determination is supported by other federal courts interpreting the IEEPA enforcement of Executive Orders.  *See United States v. Quinn*, 403 F. Supp.2d 57, 61 (D.D.C. 2005) ("Surely neither Congress in passing IEEPA nor the Executive Branch in promulgating the [Iranian Transaction Regulations] intended to foreclose prosecution of persons who knew the gist, but not the exact details, of the law they are accused of violating."); *United States v. Reyes*, 270 F.3d 1158, 1169 (7th Cir. 2001) (upholding jury verdict concluding defendant willfully violated the IEEPA and an Executive Order where the government established he knowingly shipped to an embargoed country without a license, and was aware that shipping in this manner was illegal).

**Memorandum Opinion and Order - Page 13**

executed, including those payments made on or after August 29, 1995.  Ghassan contends that he believed, at the time the Murabaha Agreement was executed, and afterward, that the $250,000 invested was Nadia's money.[11]

Ghassan claims it would be unreasonable to infer that he knew the Murabaha Agreement involved Marzook's money, or that Marzook had any interest in the $250,000 or its proceeds after its execution, since such inference assumes, without a sufficient evidentiary basis, that: (1) he knew Marzook previously invested money in Infocom or any predecessor; (2) he participated in the financial operations of Infocom, including recordkeeping or check writing; (3) he was aware of, or participated in making, any of the financial documents produced by the Government at trial; (4) he knew Marzook's name was dropped from Infocom's books and records after the Murabaha Agreement was executed; (5) he participated in renewing annually the Murabaha Agreement; and (6) he was present when Bayan made alleged misrepresentations in response to the  July 1995 subpoena, and therefore adopted the alleged misrepresentations as his own.

In addition, Ghassan argues that the language of the Murabaha Agreement suggests that even if Marzook had invested in Infocom and any predecessor, he did not any retain interest in such monies after execution, since the Agreement assigned Marzook's interest in the $250,000 to Nadia, or memorialized an assignment that had already occurred.  He contends that, even if the Murabaha Agreement did not effect an assignment, the Government presented no evidence indicating that an

---

[11]Ghassan acknowledges that he knew Marzook had received a terrorist designation, and also knew that Nadia, as well as Tariq Elashi, a child of Nadia and Marzook, had received payments from Infocom.  He contends, however, that the only reasonable inference which may spawn from these acknowledgments is that he genuinely believed the $250,000 was Nadia's money.  Moreover, Ghassan contends that even after he learned Marzook had been designated as a Specially Designated Terrorist, he still did not know whether Marzook had any interest in Infocom's payments to Nadia.

assignment did not occur before the Agreement was executed that fully divested Marzook's interest in Infocom.[12]

Finally, Ghassan contends that the consistency of Defendants' conduct from 1993 through 2001, namely, Infocom's annual renewal of the Murabaha Agreement and continued payments to Nadia, even after Marzook's August 29, 1995 designation as a terrorist, manifests strong evidence that he, as well as the other Defendants, did not know they were violating the law, and therefore did not willfully deal in the property of a Specially Designated Terrorist. He argues that such evidence leads to the alternative inference that he, and the other Defendants, genuinely believed that Nadia had invested the $250,000, and that the subsequent payments Infocom made to her were legal.

The Government counters that the totality of evidence presented at trial provided the jury a sufficient basis to reasonably conclude that the $250,000 investment made pursuant to the Murabaha Agreement was Marzook's money; that Ghassan knew Marzook retained an interest in this money after the Agreement was executed, and also knew Marzook was designated as a Specially Designated Terrorist; that Ghassan was aware of Executive Order 12947 and its prohibitions, as enforced through the IEEPA, and also understood it was unlawful to deal in property in which Marzook retained any interest; and that Ghassan's post-designation dealings in such property constituted a willful violation of the law. It contends that the Murabaha Agreement was a prop or cover that documented Nadia as investing the $250,000 in an attempt to conceal Marzook's

---

[12]In support of his contention that the Murabaha Agreement functioned as an assignment, or memorialized one that had already occurred, Ghassan states that the evidence produced at trial shows that: (1) Infocom did not pay Nadia before executing the Agreement, or send money directly to Marzook after executing it; (2) Marzook made no attempt to exercise any purported interest he retained in the $250,000 after the Agreement was executed; and (3) Marzook did not participate in subsequent annual renewals of the Murabaha Agreement.

**Memorandum Opinion and Order - Page 15**

investments in Infocom, and that the Agreement did not operate as an assignment or divestiture of Marzook's interest.

After careful consideration of the evidence considered at trial, the court concludes that the Government presented sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Ghassan willfully dealt in the property of a Specially Designated Terrorist.  First, the Government presented sufficient evidence to reasonably infer that the Murabaha Agreement was a prop or cover to conceal Marzook's investments in Infocom by creating the appearance that Nadia invested the $250,000.  It presented evidence of the three transactions representing the basis of the $250,000 invested pursuant to the Murabaha Agreement, including an Infocom bank deposit ticket dated March 25, 1993 indicating a total deposit of $50,000, and containing writing stating, "Mousa AbuMarzook ch. 3023," *see* Govt's Ex. 7B-6, and also a wire transfer receipt indicating that Marzook invested $150,000 into an Infocom corporate account on July 24, 1992, *see* Govt's Ex. 7B-4, which is verified by a Daily Transaction Log, *see* Govt's Ex. 11A-4.  Although the wire transfer receipt shows that Marzook transferred $150,000 into Infocom's account on July 24, 1992, an Infocom Aging Report reflects a $150,000 investment by Nadia on March 20, 1993.  *See* Govt's Ex. 17B.  The Government also introduced a 1993 Income Tax Return for Marzook and Nadia, who filed jointly, which stated Nadia's occupation was a "homemaker."  Govt's Ex. 16Q at 3.  Finally, the Government presented evidence connecting Ghassan to the Murabaha Agreement, as his name appears on the cover letter, along with a statement saying, "[a]s per our telephone Conversation, Please find the Agreement as we discussed."  Govt's Ex. 18 at 1.  In light of this evidence and Ghassan's position at Infocom, a jury could reasonably infer that Ghassan was involved in

Infocom's financial affairs, knew about Marzook's investments, and helped orchestrate the execution of the Murabaha Agreement.

Moreover, FBI Special Agent Robert Miranda testified at trial that during the September 2001 search of Infocom, agents found a letter addressed to Ghassan, which had been faxed on February 14, 1995, from Ismail Elbarrasse, whom Miranda described as an associate of Marzook who shared two bank accounts with him.  *See* Govt's Ex. 24.  The agents found the letter in a safe contained in Bayan Elashi's office.  Special Agent Miranda testified that two checks paid to Nadia, representing payments made in response to the letter, were forwarded to a Fairfax, Virginia post office box serving as a mailing address for an Elbarrasse/Marzook joint bank account, and that the forwarding occurred after the Murabaha Agreement was executed.  At minimum, a reasonable jury could infer from the letter that Ghassan was involved in the financial affairs of Infocom, since the letter was addressed to him.  Although the Government did not present direct evidence showing that Ghassan knew the connection between Elbarrasse and Marzook, this is a reasonable inference the jury could make.

To the extent that Ghassan and the other Defendants argued to the jury that the Murabaha Agreement operated as a legal assignment to Nadia of Marzook's interest in the $250,000, a determination by a jury that the Agreement did not operate as an assignment is supported by sufficient evidence.  As the Agreement states Nadia "will pay" $250,000 in the future, *see* Govt's Ex. 18 at 2, does not reference Marzook's preexisting investments, and contains no language of an express transfer from Marzook to Nadia indicative of an intent to assign, sufficient evidence exists

for a jury to infer that the monies did not change character, and that the document effected a

concealment instead of an assignment or a divestiture.[13]

The court concludes that sufficient evidence was presented for a reasonable jury to find the

element of willfulness.  Special Agent Miranda testified at trial that, during the September 2001

search of Infocom, agents recovered a paper copy of Executive Order 12947 (Govt's Ex. 20A) from

Ghassan's office.  As a hard copy of the law Defendants allegedly violated was found on the

premises during the 2001 search, a jury could reasonably infer, from such evidence, that Ghassan

was apprised of the law and knew dealing in property in which Marzook had any interest, post-

designation, was unlawful.  In addition, a jury could infer from evidence of certain Foreign

---

[13]Although Defendants argue that the Agreement constitutes an assignment, ample evidence exists to support a conclusion that it did not.  A valid assignment "may be made either orally or in writing."  *United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 630 (5th Cir. 1992), *cert. denied*, 507 U.S. 917 (1993).  "[T]here is no required form in which an assignment for value must be made; all that is necessary is for the assignor so to express himself as to indicate an intention then and there to transfer his right to the assignee."  *Id.* (quoting 4 Arthur L. Corbin, *Corbin on Contracts*, § 879, at 528 (1951 & Supp. 1991)).  For an assignment to be found, "it must be clear that the assignor intends to give and the assignee intends to receive present ownership of the fund."  *In re Gibraltar Resources, Inc.*, 211 B.R. 216, 221 (Bankr. N.D. Tex. 1997).  Moreover, in order "to effectuate a valid transfer of an interest in a particular fund,  the transfer must be such as to leave the assignor with no control over the fund."  *Stowell v. Macandrews & Forbes*, 956 F.2d 96, 99 (5th Cir. 1992).

A jury could reasonably infer that Defendants failed to present sufficient evidence of (1) intent to assign, and (2) total relinquishment of control.  The plain language of the Agreement does not evidence that Marzook intended to give Nadia present ownership interest in monies he had previously invested; nor does it evidence that Nadia intended to receive such ownership.  *See In re Gibraltar Resources, Inc.*, 211 B.R. at 221.  In addition, no evidence was presented concerning the details of the conversation between Ghassan and Nadia, as referenced in the cover letter to the Agreement, including whether Nadia told Ghassan that Marzook had previously assigned his interest to her.  Turning to relinquishment of control, sufficient evidence exists from which a jury could reasonably infer that Marzook retained an interest in the monies after the Murabaha Agreement was executed.  For example, the Government presented evidence of at least two Foreign Intelligence Surveillance Act ("FISA") cuts, *see* Govt's Ex. 25E, 38B, in which Nadia and Marzook, among others, discussed Ghassan sending or transferring money.  Nothing in the record indicates that an assignment took place, and the court will not infer an assignment when the evidence presented does not support the inference.

Moreover, the court determines that even if the Murabaha Agreement was a contract which assigned or otherwise divested all of Marzook's interests in Infocom to Nadia, thereby effectively changing the character of the monies previously invested, the monies would nevertheless be subject to Executive Order 12947.  The Executive Order contains language stating that the mandates its set forth apply "notwithstanding any contract entered into . . . prior to the effective date  . . . ."  Exec. Order 12947 § 1.  The court interprets this language to mean that even if an assignment had occurred, the Executive Order would nullify the assignment, since the assignment would have been a "contract entered into . . . prior to the effective date . . . ."  *See id.*

Intelligence Surveillance Act ("FISA") cuts, *see* Govt's Ex. 26A-D, which were admitted only as to Ghassan, as well as other electronic intercepts played during trial, that Ghassan knew about Marzook's interests in Infocom, that Marzook and Nadia relied upon Ghassan for routine management of these interests even after Marzook's designation, and that he communicated with Nadia to manage these interests. For example, evidence was introduced of a call between Ghassan and Nadia on March 21, 1996, after Marzook's designation, in which Ghassan questioned Nadia about contact she had with a *Dallas Morning News* reporter, and inquired whether she discussed the topics of "money and computers." *See* Govt's Ex. 25A. There was evidence of another call between Nadia and Marzook dated September 27, 1996, also post-designation, in which Nadia informed Marzook that she told Ghassan to have money transferred to her. *See* Govt's Ex. 25E. The Government also presented evidence of a call dated December 19, 1997, involving several persons, including Marzook, Nadia, and Tariq, their son, in which the following conversation transpired:

Tariq:        And, Dad, Ghassan hasn't sent the money yet. I tried to call him . . . .

Marzook:        Son, if I call him from here I will lose $200 just to tell him to send them.

Govt's Ex. 38B at 4. The court determines that a reasonable inference could be drawn, from this piece of evidence, that Ghassan knew Marzook retained interest in the payments Infocom sent to Nadia.

Finally, Robert McBrien, chief of OFAC's International Programs Division, testified at trial that Ghassan attended a meeting at OFAC in Washington, DC, and that the meeting took place in February 1995. According to McBrien, the meeting occurred in response to Executive Order 12947, which issued on January 23, 1995. He testified that, although he could not recall the details of the conversation, the purpose of the meeting was to discuss the Executive Order with representatives

**Memorandum Opinion and Order - Page 19**

of various Arab American charitable associations, and to tell them how the executive order operated. He further stated that the issue of to whom they could send funds would have been a logical discussion topic. Ghassan's name appears on a list of attendees at the meeting, along with a corresponding reference to "Holy Land Foundation." Defs' Ex. 174. He contends that the meeting regarded charitable funding issues relating to the Holy Land Foundation instead of whether Infocom could continue making payments to Nadia. Sufficient evidence exists, however, for a jury to infer that even if Ghassan attended the meeting in his capacity as representative of the Holy Land Foundation, he was nevertheless apprised of Executive Order 12947 and its operation, and used the knowledge for other purposes. Likewise, although Marzook had not received a terrorist designation as of the time of the meeting, a jury could reasonably infer that Ghassan, having been placed on notice about Executive Order 12947, and later learning of Marzook's designation, knew he could not deal with property in which Marzook had any interest.

The court concludes that ample evidence exists in the record from which a jury could reasonably infer that Ghassan dealt in the property of a Specially Designated Terrorist. Accordingly, Ghassan's motion with respect to a request for judgment of acquittal on Counts 2 through 11 should be denied.

### 2. Conspiracy to Deal in the Property of a Specially Designated Terrorist

In a conspiracy case, "an agreement may be inferred from concert of action, voluntary participation may be inferred from a collocation of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Bieganowski*, 313 F.3d 264, 277 (5th Cir. 2002), *cert. denied*, 538 U.S. 1014 (2003). Upon reviewing the evidence, the court determines that sufficient evidence was presented during trial for a reasonable jury to have found the essential

elements of conspiracy to deal in the property of a Specially Designated Terrorist, as alleged in Count 1.[14]

During trial, the Government presented two main pieces of evidence against all Defendants in support of its contention that Defendants, including Ghassan, conspired to deal in the property of a Specially Designated Terrorist. First, it presented testimony from Special Agent Harkins in support of its assertion that Bayan made patently false statements to FBI agents in response to the July 1995 subpoena which the other Defendants voluntarily adopted. Second, it presented evidence of the September 24, 2001 letter written by Arch McColl in response to OFAC's Blocking Notice. The Government contends that the letter reinforced the position that Bayan provided the FBI agents, adopted by the other Defendants, in response to the July 1995 subpoena.

The court first turns to the July 1995 subpoena. The subpoena, which Harkins served upon Infocom on July 31, 1995, mandated Infocom's "custodian of records" to produce "forthwith" the following:

> Any and all records pertaining to any closed or open accounts for Nadia Mohammed Elashi, including without limitation, the following:
> 1. agreements
> 2. murabaha agreements
> 3. contracts
> 4. statements
> 5. wire transfers
> 6. cancelled checks
> 7. correspondence

---

[14]The court notes that each non-corporate Defendant argues, in some form or another, that he did not fully participate in Infocom's financial dealings, including Bayan, Infocom's President, who claims that he at times wrote checks without knowing or inquiring about the reason why a recipient needed money. A defendant need not participate in all aspects of the conspiracy to be convicted, as "even minor participation in the conspiracy may serve as the basis for a conviction." *Bieganowski*, 313 F.3d at 277. Indeed, "one cannot escape criminal liability on the basis that [he] played a relatively minor role in the total scheme." *Salazar*, 958 F.2d at 1295. Considering the nature of Infocom as a family-run corporation, the closeness of the Elashi family, and each Defendant's respective position at Infocom, the assertions by Ghassan, Basman, and Bayan that each had little or no knowledge of the company's financial matters do not square with common sense and reason.

**Memorandum Opinion and Order - Page 21**

8. credit checks
9. any of the above pertaining to Mousa Mohamed Abu Marzook.

Govt's Ex. 30A. Harkins testified at trial that on July 31, 1995, the same day the subpoena was served, Bayan signed an FBI Form FD-597 inventory list (Govt's Ex. 30B) prepared in response to the subpoena. He further testified that Bayan assured the agents that the documents produced included everything that complied with the subpoena. According to Harkins, Bayan stated that there were no other agreements, contracts, or transactions with Marzook or Nadia prior to the Murabaha Agreement, other than those provided in response to the subpoena. Harkins also testified that Bayan advised him that the 13 monthly bank statements listed on the Form FD-597 were the only bank statements reflecting an instance when Infocom issued a check to Marzook or Nadia.

Harkins further testified at trial that all Defendants were present when Bayan produced the documents in response to the subpoena, and that Ghassan and Basman said nothing. In addition, he testified that he had some interaction with each Defendant on July 31, 1995, and that he interviewed Bayan and Basman. Moreover, he testified that he spoke with Ghassan when he first arrived at Infocom to serve the subpoena, that Ghassan was "in and out" during the subpoena response, but that he was in the same room when his brothers spoke with the agents.

According to the Government, the jury could, and did, infer that Bayan's statements in response to the subpoena requests, adopted by the other Defendants, falsely represented the totality of Infocom's dealings with Marzook, as shown when contrasted with documents recovered from Mohammad Azad, Infocom's former accountant, and documents taken from Infocom during the September 2001 search. It contends that Ghassan and Basman's failure to clarify, or in any way correct or alter, Bayan's statements evidenced an agreement or scheme by Defendants to use the Murabaha Ageement as a prop or cover to conceal Marzook's investments in Infocom; and that the

statements served as knowingly false representations consistent with their scheme. Ghassan contends that such inference cannot be imputed to him, since he was "in and out" of any discussions that Bayan and Basman may have had with the agents. Harkins's testimony, however, would allow a reasonable jury to conclude that the Defendants, including Ghassan, knowingly agreed not to comply fully with the subpoena in order to prevent the disclosure of documents linking Infocom with Marzook.

The court now turns to the September 24, 2001 letter submitted to OFAC by Infocom's then attorney in response to OFAC's Blocking Notice.[15] Although the letter does not state specifically the Defendants to which it applies, the letter appears to be written on behalf of Infocom, and begins by stating, "[w]e are sending you . . . ." Govt's Ex. 34 at 5. The letter contains itemized responses to the numbered requests for information appearing in the Blocking Notice. It states, among other things, that "All of Infocom's contacts were with Nadia Elashi," *see id.*, and that "[t]he total and complete extent of the financial relationship between Nadia Elashi and Infocom is defined in the Murabaha Agreement of 1993 attached hereto. Infocom has never handled any other money received from either Nadia Elashi or Mr. Marzook." *Id.* at 6.[16]

---

[15]OFAC's Blocking Notice, issued September 5, 2001, was addressed to "Mr. Bayan Elashi, President . . . Infocom Corp." Govt's Ex. 34 at 18.

[16]At the February 1, 2006 postverdict motions hearing, Defendant Basman Elashi renewed his objection to the letter on grounds that it was dated "September 24, 2001," a date after "July 2001," the concluding date for both conspiracies, as alleged in the revised superseding indictment. *See* Rev. Supers. Indict. at 7, 13. At trial, the court concluded that the statements in the letter were admissible pursuant to Fed. R. Evid. 801(d)(2). Upon review, McColl's letter was also an act, committed by the Defendants, relevant to the alleged conspiracy, that occurred after the conspiracy was alleged to have concluded. In other words, the letter "relates back" to matters that occurred within the dates of the alleged conspiracy. Acts of one alleged conspirator can be admitted into evidence against the other conspirators, "if relevant to prove the existence of the conspiracy, even though they might have occurred after the conspiracy ended." *Anderson v. United States*, 417 U.S. 211, 219 (1974); *see also Lutwak v. United States*, 344 U.S. 604, 618 (1953). The letter of September 24, 2001 is further evidence of the existence of the conspiracy. While it may be desired that all relevant evidence occur during the time frame set forth in an indictment, all acts evidencing a conspiracy do not always fit neatly within such time frame.

**Memorandum Opinion and Order - Page 23**

The Government contends that since the letter was written in the form of the collective "we," it is evidence of a conspiracy attributable to all Defendants, including Ghassan.  It asserts that a jury could reasonably infer that the letter reiterates the same position taken by Defendants in response to the July 1995 subpoena, and therefore evidences conduct in furtherance of a conspiracy.  The court determines that a reasonable jury could make such inference.

As discussed above, the Government presented sufficient evidence for a jury to reasonably infer that the Murabaha Agreement was a prop or cover to conceal Marzook's investments in Infocom by creating the appearance that Nadia invested the $250,000.  In addition, a reasonable jury could interpret Ghassan's name on the cover page of the Murabaha Agreement, and Bayan's signature the actual contract, to be evidence showing an agreement to conceal, the continuation of which would later become illegal.  Likewise, it could reasonably deduce that the presence of Elbarrasse's letter in Bayan's safe, which was addressed to Ghassan, evidences that Defendants shared documents and discussed company affairs with each other.

In addition, the close relationship of the Elashi family, and particularly, Infocom's status as a family-owned and operated business, can be part of the circumstantial evidence from which a reasonable jury may infer that each Defendant agreed, or joined in an agreement, to deal in property in which Marzook retained an interest, knowing such dealing was unlawful.  *See United States v. Investment Enters., Inc.*, 10 F.3d 263, 267 n.4 (5th Cir. 1993) ("Close relationships can be a part of the circumstantial evidence from which a jury may infer that the defendant knew of a conspiracy.") (citation omitted).[17]  A reasonable jury could infer from the totality of the evidence presented,

---

[17]*See also United States v. Soape*, 169 F.3d 257, 264 (5th Cir.) ("Although [intent in a conspiracy case] may not be proven solely by a family relationship . . . it may be shown by circumstantial evidence . . . and when inferences drawn from the existence of a family relationship or 'mere knowing presence' are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction.") (quotations and internal citations omitted), *cert. denied*, 527 U.S. 1011 (1999).

**Memorandum Opinion and Order - Page 24**

including evidence that Infocom is family-run; that Marzook is the husband of Nadia, who is a cousin of Ghassan, Bayan, and Basman; that Marzook was a leader in Hamas; that Marzook had been designated as a Specially Designated Terrorist; and evidence showing the financial history between Marzook and Infocom and any predecessor, that Defendants conspired to deal in the property of a Specially Designated Terrorist.  *Cf. Soape*, 169 F.3d at 265 (explaining that intent to conspire may be inferred "from the combination" of a defendant's "own actions" and a "close relationship" with the other defendants).  Accordingly, the court concludes, reviewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in support of the verdict, that a reasonable jury could find beyond a reasonable doubt that Ghassan was guilty of conspiracy to deal in the property of a Specially Designated Terrorist.

### 3.      Money Laundering

Ghassan's money laundering convictions, like Bayan and Infocom's, are based upon the jury's finding that he committed the financial transactions listed as overt acts in Counts 13 through 21, involving the underlying specified activity of dealing in the property of a Specially Designated Terrorist, as set forth in Count 2.  Essentially, the Government asserts that money laundering is a natural and actual consequence of dealing in the property of a Specially Designated Terrorist, and contends that a conviction for a substantive count charging dealing in the property of a Specially Designated Terrorist triggers liability for the corresponding money laundering count.  The Government's position, however, ignores the court's jury instructions, which directed the jury to perform an independent analysis of the money laundering charges based upon well-established law concerning the offense of money laundering pursuant to 18 U.S.C. § 1956.  The court will not rubberstamp the money laundering convictions merely because the jury convicted Ghassan, Bayan,

and Infocom of Count 2, as well as Counts 3 through 11; instead, it will analyze under the essential elements of money laundering. *See* Ct's Instr. to Jury at 23-25.

Upon review, the court determines that the evidence presented at trial was sufficient for a reasonable jury to have found each essential element of money laundering beyond a reasonable doubt, and therefore convict Ghassan on Counts 13 through 21. It is clear from the evidence that Infocom continued making payments to Nadia after Marzook received a terrorist designation, and that a jury could reasonably infer that Ghassan, through the routine management of Marzook and Nadia's interests, knowingly conducted these financial transactions, or at least aided and abetted others in making them. For the reasons stated previously, a jury could also reasonably infer from the evidence that Ghassan willfully dealt in the property of a Specially Designated Terrorist, as alleged in Counts 2 through 11. As the offense of dealing in such property is enforced under section 206 of the IEEPA, the offense is a "specified unlawful activity" for purposes of money laundering. 18 U.S.C. § 1956(c)(7)(D). For the reasons stated in its discussion regarding Counts 2 through 11, the court is satisfied that sufficient evidence existed for a reasonable jury to infer that Ghassan knew that Marzook retained an interest in the monies transacted, and this same inference establishes knowledge under section 1956(a)(1)(B)(i). Ghassan acknowledged that he knew Marzook was designated as a Specially Designated Terrorist, and the evidence supports an inference that he was apprised of Executive Order 12947 and its prohibitions. To the extent Ghassan argues that the jury could have concluded, from the evidence presented, that he genuinely believed Marzook had no interest in the transactions at issue, and therefore the transactions involved legitimate funds, he ignores that the jury was free to discredit any explanation suggested or argued on his behalf, in favor of the Government's. *See United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir.) (explaining that

the jury heard evidence from both sides as to the source of the money, but concluded that the defendant laundered the money), *cert. denied*, 536 U.S. 913 (2002).

The court now turns to the "designed to conceal" element.  A "particular transaction must be viewed in context when determining whether it was designed to conceal." *Burns*, 162 F.3d at 848; *see also United States v. Pipkin*, 114 F.3d 528, 534 (5th Cir. 1997) ("[C]oncealment can be established by showing that the transaction is part of a larger scheme designed to conceal illegal proceeds.") (citations and quotation omitted).  Sufficient evidence exists for a reasonable jury to infer that the payments from Infocom to Nadia, made pursuant to the Murabaha Agreement, were attempts to conceal Marzook's interest in the monies he invested, as well as the proceeds from such monies, and that although such attempts to conceal were not illegal before Marzook's designation, the payments became illegal post-designation, since these same transactions, made post-designation, became attempts to conceal blocked monies.[18]  Evidence of the transaction history presented to the jury, beginning with Marzook's alleged pre-Murabaha Agreement investments, then the execution of the Agreement, then payments to Nadia continuing post-designation, provides the basis for an inference that the payments were made with an intent to conceal, and such concealment, albeit not illegal when it began, became illegal upon Marzook's designation as a Specially Designated Terrorist.  Moreover, sufficient evidence exists for a reasonable jury to conclude that Infocom's payments to Nadia made after Marzook's designation were a continuation of an attempt to disguise Marzook's interest by use of a third party.  *Cf. Pipkin*, 114 F.3d at 534 ("In determining whether there is a larger scheme to conceal proceeds, the defendant's use of a third party . . . usually

---

[18]"Many financial transactions have the effect of concealing illegal proceeds by converting them into a more legitimate form, and by adding one more degree of separation between the illegal proceeds and the original unlawful activity." *Burns*, 162 F.3d at 848 (citations omitted).

**Memorandum Opinion and Order - Page 27**

constitutes sufficient proof of a design to conceal.") (citation and quotation omitted).  A jury could thus view the post-designation transactions as steps in a scheme designed to distance Infocom from Marzook by concealing his investments.  Accordingly, the court concludes that sufficient evidence exists for a reasonable jury to convict Defendant Ghassan Elashi on counts 13 through 21.

### 4.	Conspiracy to Commit Money Laundering

The court determines that there was sufficient evidence presented during trial to satisfy the Government's burden of proof as to Count 12.  As discussed above, the conclusion that Ghassan laundered money is supported by sufficient evidence.  A rational jury could also conclude that the evidence taken as a whole established the essential elements of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), beyond a reasonable doubt.   It is well-settled that a conspiracy may be proved by circumstantial evidence, and "the agreement need not be formal or spoken." *Tencer*, 107 F.3d at 1132.  The court is convinced that the jury made a conclusion based upon the evidence presented and the credibility of the witnesses.

### 5.	Conclusion regarding Ghassan's Motion

Contrary to Ghassan's assertions, upon reviewing the evidence presented in the light most favorable to the Government and drawing all reasonable inferences in support of the verdict, the court determines that a rational jury could find beyond a reasonable doubt that the Government established the essential elements of (1) conspiracy to deal in the property of a Specially Designated Terrorist; (2) dealing in the property of a Specially Designated Terrorist; (3) conspiracy to commit money laundering; and (4) money laundering.  Accordingly, Defendant Ghassan Elashi's Rule 29(c) Renewal of Motion of Judgment of Acquittal should be denied.

### B.	Basman Elashi's Motion for Judgment of Acquittal

Defendant Basman Elashi contends that the evidence is legally and factually insufficient to satisfy the Government's burden of proof on Counts 1, 2, and 12, and therefore requests the court to enter a judgment of acquittal on these counts.  He asserts that the evidence presented cannot support a finding that he entered in an agreement to deal in the property of a Specially Designated Terrorist (Count 1), or that he dealt directly or indirectly in the property of a Specially Designated Terrorist (Counts 1 and 2).  As to Count 12, conspiracy to commit money laundering, Basman contends that his conviction is unwarranted because the jury acquitted him of all nine substantive counts charging him with dealing in the property of a Specially Designated Terrorist, as well as all nine substantive counts charging him with money laundering.  The court disagrees.

### 1.     Dealing in the property of a Specially Designated Terrorist

Basman challenges the determination that he "willfully" dealt in the property of a Specially Designated Terrorist, and contends that the evidence presented at trial was insufficient for a reasonable jury to conclude that he knew Marzook was designated as a Specially Designated Terrorist or that he knowingly sought to violate the law by dealing in property in which Marzook retained an interest.  Basman asserts that the only evidence the Government offered in support of his conviction on Count 2 was a handwritten computation and an address book, both found in his office during the September 2001 search of Infocom.  He contends such evidence is insufficient to support a conviction because no handwriting expert or other evidence was offered linking these exhibits to him.  He also contends that all other circumstantial evidence linking him to the offense is equally consistent with innocent activity and therefore legally and factually insufficient to support

a conviction.[19]  In support of his contention that the evidence, at best, presents a tie, Basman points

out that the Jury acquitted him of Counts 3 through 11, the substantive counts charging him with

dealing in the property of a Specially Designated Terrorist, even though the court provided the jury

a *Pinkerton* charge in its jury instructions.

Upon review of the evidence, the court determines that sufficient evidence was presented

during trial for a rational jury to conclude beyond a reasonable doubt that Basman willfully dealt in

the property of a designated terrorist.  Contrary to Basman's assertion, the court determines that the

handwritten computation and the address book are pieces of circumstantial evidence upon which a

rational jury could infer that Basman knew Marzook made the $250,000 investment, and that

Basman was involved in the financial operations of Infocom.   One entry on the handwritten

computation states, "Musa = 250,".  Govt's Ex. 31A.  The notation was written on the reverse side

of a Vendor Voucher dated "1/26/94."   *Id*.   In addition, the address book contains an entry for

Marzook spelled "Musa AbuMarzook."  Govt's Ex. 45 at 3.  Although the court agrees with Basman

that the Government did not specifically prove that he made the entries, there is sufficient evidence

for a rational jury to infer that he did.   Moreover, even if a jury were to conclude that Basman did

not write either entry, since the handwritten computation and the address book were both found in

Basman's office, and in light of other evidence relating to Basman, it could still reasonably infer that

Basman knew about Marzook's investments in Infocom.

Turning to Basman's contention that there was insufficient evidence upon which to conclude

that he knew Marzook was designated as a Specially Designated Terrorist, evidence was presented

---

[19]Basman also argues that the Murabaha Agreement effectively assigned whatever interest Marzook had in the monies reflected in the Agreement to Nadia.  As discussed above, *see supra* note 13, the jury was free to choose among reasonable constructions of the evidence.  *See Loe*, 262 F.3d at 434.  There was more than sufficient evidence for the jury to determine that the Agreement was not an assignment.

**Memorandum Opinion and Order - Page 30**

during trial that Basman was present during the July 1995 subpoena response, and a rational jury could infer that this would have placed Basman on notice to track Marzook's status.  In addition, a rational jury could reasonably infer Basman's knowledge because of his apparent inconsistent position regarding whether Marzook had invested in Infocom.  FBI Special Agent James Lewis testified at trial that, when he interviewed Basman at his residence on the morning of September 5, 2001, Basman stated that he did not know the source of the $250,000 investment.[20]  A rational jury could contrast this statement, made post-designation, with the handwritten computation, presumably written pre-designation, to infer that Basman attempted to conceal Marzook's investment to Special Agent Lewis because he knew Marzook was designated as a Specially Designated Terrorist.

Finally, the September 24, 2001 letter, as well as its attachments, and the above-described evidence provide sufficient evidence upon which a jury could reasonably infer that Basman willfully dealt in the property of a Specially Designated Terrorist.  Evidence was presented at trial that the September 24, 2001 letter contained attachments that were faxed by Basman.  The fax cover sheets (Govt's Ex. 34 at 12-13) which were included in the attached materials, state "FROM:  Basman," and were sent on an Infocom fax stationery.  At trial, the Government presented evidence that one of the faxed pages, a Vendor Voucher (Govt's Ex. 34 at 14), purported to show that Nadia made the three payments comprising the $250,000 invested into Infocom pursuant the Murabaha Agreement.  Basman contends that he faxed the documents in his capacity as Infocom's logistics and credit manager, and, as faxing was part of his job duties, he did not compile the financial records that were

---

[20]At the February 1, 2006 hearing, Basman noted that the conversation between him and Lewis, which took place on September 5, 2001, occurred after "July 2001," the concluding date for both conspiracies and for the offense set forth in Count 2, as alleged in the revised superseding indictment.  The statements Basman made to Lewis are not hearsay, *see* Fed. R. Evid. 801(d)(2).  In addition, the statements, in and of themselves, serve as conduct which relates back to matters that occurred within the dates of the alleged conspiracies, and is additional evidence that the conspiracies existed.  *See supra* note 16.

**Memorandum Opinion and Order - Page 31**

faxed.  The court notes, however, that the name "Basman" appears at the bottom of the Vendor Voucher at issue, *see id*., which provides evidence for an inference that Basman prepared, or assisted in preparing, the documents.  The court determines that sufficient evidence exists for a rational jury to infer that Basman knew the contents and import of the documents he faxed, and therefore knowingly faxed documents containing misrepresentations to Arch McColl, Infocom's then attorney, with the intent for McColl to forward them to OFAC.  In light of the totality of the evidence presented, the court determines that a reasonable jury could conclude, beyond a reasonable doubt, that Basman willfully dealt in the property of a Specially Designated Terrorist.

### 2.    Conspiracy to deal in the property of a Specially Designated Terrorist

Basman challenges his conviction on Count 1 by contending that the Government presented insufficient evidence to support a finding that he entered into an agreement to deal in the property of a Specially Designated Terrorist.  The court disagrees.  As the court held with respect to Ghassan, it determines that Special Agent Harkins's testimony would allow a reasonable jury to conclude that Defendants, including Basman, knowingly agreed not to fully comply with the July 1995 subpoena, in an effort to prevent the disclosure of documents linking Infocom with Marzook.  Moreover, the court determines that a jury could reasonably infer that the September 24, 2001 letter reiterates the statements made by Bayan in response to the subpoena request, which were made in Basman's presence, and therefore evidences conduct in furtherance of or part of a conspiracy.  Finally, it would be reasonable to infer that Basman's act of faxing the documents to McColl was part of the Defendants' concert of action, and signified his knowing participation in an agreement designed to

**Memorandum Opinion and Order - Page 32**

conceal or otherwise misrepresent Marzook's investment history in Infocom.[21]  The court therefore concludes, reviewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in support of the verdict, that a reasonable jury could find beyond a reasonable doubt that Basman was guilty of conspiracy to deal in the property of a Specially Designated Terrorist.

### 3.        Conspiracy to Commit Money Laundering

Basman asserts that he could not be convicted of Count 12, conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h), because the Government failed to present sufficient evidence to establish Count 2, dealing in the property of a Specially Designated Terrorist, which is the specified underlying offense that would support a conviction for money laundering.  As discussed above, sufficient evidence was presented during trial to support Basman's conviction on Count 2, and the court therefore rejects Basman's assertion.  Moreover, the court agrees with the Government that the jury was free to acquit Basman of Counts 13 through 21, the substantive money laundering charges, and therefore reject the Government's *Pinkerton* theory of liability as to Basman, but nevertheless convict Basman of Count 12, conspiracy to commit money laundering. This is because the jury was permitted to find that Basman knowingly entered into an agreement with Bayan and Ghassan to launder money, or voluntarily agreed to join a preexisting agreement, without finding, at least beyond a reasonable doubt, that Basman conducted, or aided and abetted the conducting of, the financial transactions comprising the basis of the substantive money laundering counts.

---

[21]To be convicted of engaging in a criminal conspiracy, a defendant "need not know all the details of the unlawful enterprise . . . so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." *United States v. Garcia Abrego*, 141 F.3d 142, 155 (5th Cir.), *cert. denied*, 525 U.S. 878 (1998).

As "[a] conspiracy does not merge with the substantive offense," *United States v. Nims*, 524 F.2d 123, 126 (5th Cir. 1975), *cert. denied*, 426 U.S. 934 (1976), "conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy." *United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir.), *cert. denied*, 528 U.S. 871 (1999).  In this same vein, conspiracy to commit money laundering is wholly separate and distinct from the offense of money laundering, since prosecution under 18 U.S.C. § 1956(h) does not require proof of the elements of the substantive offense of money laundering under 18 U.S.C. § 1956(a)(1). *See Threadgill*, 172 F.3d at 367.

The court is satisfied, based upon the evidence presented during trial, that a reasonable jury could conclude that the totality of the evidence established the essential elements of conspiracy to commit money laundering as to Basman beyond a reasonable doubt.  Sufficient evidence exists for the conclusion that Basman knowingly agreed with Bayan and Ghassan to launder money, or voluntarily agreed to join a preexisting agreement to launder money, and that the Defendants committed at least one overt act in furtherance of the conspiracy.  *See Wilson*, 249 F.3d at 379. Basman's motion with respect to Count 12 should therefore be denied.

### 4.    Conclusion regarding Basman's Motion

Upon reviewing the evidence presented in the light most favorable to the Government and drawing all reasonable inferences in support of the verdict, the court determines that a rational jury could find beyond a reasonable doubt that the Government established the essential elements of (1) conspiracy to deal in the property of a Specially Designated Terrorist; (2) dealing in the property of a Specially Designated Terrorist; and (3) conspiracy to commit money laundering.  Accordingly,

Defendant Basman Elashi's Motion for Judgment of Acquittal Pursuant to Rule 29, Federal Rules of Criminal Procedure should be denied.

### C.      Basman Elashi's Motion for New Trial

Basman also timely filed a motion for new trial pursuant to Fed. R. Crim. P. 33.  He requests the court to grant a new trial as to Count 12 of the revised superseding indictment, which charged conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  According to Basman, the court should grant a new trial because the jury verdict is inconsistent.  The jury convicted Basman of Count 12, but acquitted him of Counts 3 through 11, the substantive counts charging him with dealing in the property of a Specially Designated Terrorist, as well as Counts 13 through 21, the substantive counts charging him with money laundering.  He argues that the jury cannot convict him of Count 12, but acquit him of Counts 3 through 11, and 13 through 21.  Put another way, he contends that a conviction on Count 2, dealing in the property of a Specially Designated Terrorist, is not enough to support the conspiracy conviction on Count 12.

The Government contends that it was legally permissible for the jury to acquit Basman on all substantive counts derived from the overt acts yet still convict him of conspiracy to commit money laundering.  The court agrees.  Although Basman premises his motion on an inconsistent jury verdict, the verdict is not, in fact, inconsistent.  "[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643 (1946); *see also Threadgill*, 172 F.3d at 367.  The "essence of the crime of conspiracy is the agreement rather than the commission of the objective substantive crime." *Nims*, 524 F.2d at 126.  Also, as explained previously, prosecution under section 1956(h) does not require proof of the elements of the substantive offense of money laundering under 18 U.S.C. § 1956(a)(1). *See*

*Threadgill*, 172 F.3d at 367.  The jury's decision to acquit Basman of the substantive counts of money laundering, as well as dealing in the property of a Specially Designated Terrorist, does not mean that it erred in convicting him of conspiracy to commit money laundering.

In addition, that the jury rejected, or decided not apply, the Government's *Pinkerton* theory of liability as to Basman on the substantive counts of money laundering, thereby acquitting him of Counts 13 through 21, does not mean that it erred by convicting Basman of Count 12.  Under the rule established in *Pinkerton*, a defendant may be liable for his coconspirator's substantive offenses so long as the acts were reasonably foreseeable and done in furtherance of the conspiracy.  *See Pinkerton*, 328 U.S. at 647; *United States v. Wilson*, 105 F.3d 219, 221 (5th Cir.), *cert. denied*, 522 U.S. 847 (1997).  While the court provided the jury a *Pinkerton* instruction, the court instructed the jury that the application of *Pinkerton* was optional.  *See* Ct's Instr. to Jury at 16 (instructing, "you *may* find such defendant guilty . . . .") (emphasis added).  Accordingly, the verdict is neither inconsistent, nor a miscarriage of justice.

Even if the jury's verdict were inconsistent, such inconsistency would not be fatal to the conviction.  An inconsistent jury verdict is not a bar to conviction so long as there is sufficient evidence to support the jury's determination of guilt.  *See United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999); *see also United States v. Sylvester*, 143 F.3d 923, 930 (5th Cir. 1998).  The court has determined that sufficient evidence was presented during trial to support Basman's conviction on Count 2, dealing in the property of a Specially Designated Terrorist, and Count 12, conspiracy to commit money laundering.  In addition, an inconsistent jury verdict is an improper ground for

granting a new trial, as a motion for judgment of acquittal is the proper protection against potential jury error or irrationality.  *See United States* v. *Powell*, 469 U.S. 57, 67 (1984).[22]

Upon review, the court concludes that it was legally permissible for the jury to convict Basman of Counts 2 and 12, yet acquit him of Counts 13 through 21, the substantive counts charging him with money laundering, and Counts 3 through 11, the substantive counts charging him with dealing in the property of a Specially Designated Terrorist.  Accordingly, Defendant Basman Elashi's Motion for New Trial Pursuant to Rule 33, Federal Rules of Criminal Procedure, should be denied.

### D.    Bayan Elashi and Infocom Corporation's Motion for Judgment of Acquittal and Motion Adopting Other Defendants' Motions

On April 13, 2005, the jury convicted Defendant Bayan Elashi, as well as Defendant Infocom, on all counts.  On May 13, 2005, Bayan and Infocom filed a postverdict motion for judgment of acquittal and "Motion Adopting Other Defendants' Motions."[23]

---

[22]Basman acknowledges that he is aware of the holdings in *Powell*, 469 U.S. at 65 (holding "inconsistent verdicts . . . should not necessarily be interpreted as a windfall to the Government at the defendant's expense"), and *United States v. Zuniga-Salinas*, 952 F.2d 876 (5th Cir. 1992) (holding "an inconsistent verdict is not a bar to conviction . . . ."), but argues that the facts in his case are distinguishable.  In *Powell*, a jury acquitted the defendant of conspiracy, but convicted her of the charged compound offense of using the telephone to facilitate the conspiracy.  Basman contends that his facts are distinguishable because the jury convicted him of conspiracy to commit money laundering, but acquitted him of the substantive counts of money laundering.  Basman mistakenly argues that because the facts in *Powell* differ from those in his case, *Powell* cannot apply.  The distinction he draws is of no consequence.  In addition, the decision in *Zuniga-Salinas,* which reversed a judgment of acquittal granted because a jury convicted one defendant of conspiracy but acquitted his sole coconspirator, is irrelevant, other than its holding that an inconsistent jury verdict is not a bar to conviction.

[23]The court determines that the language "and Motion Adopting Other Defendants' Motions" contained in the postverdict motion for judgment of acquittal filed by Defendants Bayan Elashi and Infocom is an improper request for a motion for new trial pursuant to Fed. R. Crim. P. 33.  Basman's motion for new trial, which challenges his conviction on Count 12 based upon his acquittal on Counts 3 through 11, and 13 through 21, is unique and applies only to him.  As the jury convicted Bayan and Infocom on all counts, including all substantive counts, the arguments asserted in Basman's motion for new trial do not apply.  Likewise, since Bayan and Infocom were convicted on all counts, and Basman predicates his motion for new trial on an alleged inconsistent jury verdict, Bayan and Infocom cannot be said to have adopted Basman's motion.  Accordingly, the court **disregards** the language, "and Motion Adopting Other Defendants' Motions," and will only consider Bayan and Infocom's motion as one for judgment of acquittal pursuant to Fed. R. Crim. P. 29.

1.        **Bayan Elashi**

Bayan contends that the Government failed to present sufficient evidence to establish that he "willfully" dealt in the property of a Specially Designated Terrorist, and therefore argues that the evidence falls short of the requisite standard on presumably all counts, but specifically on Counts 1, 2, and 12. He asserts that the Government assumed, without proving, that Bayan knew about all predicate facts concerning the investment history between Marzook and Infocom, and any predecessor. He argues that the evidence presented at trial gives equal or near equal circumstantial support to a theory of guilt and a theory of innocence, and since the evidence leads to a tie, the court must grant his motion for judgment of acquittal.

a.        **Dealing in the property of a Specially Designated Terrorist**

Bayan contends that there was no evidence, or at least insufficient evidence, presented during trial that he knew Marzook had been designated as a Specially Designated Terrorist. As support, Bayan points out that agents found no materials in his office that could be viewed as having notified him about Marzook's designation. He also notes that the paper copy of Executive Order 12947 was found in Ghassan's office, and contends that the Government produced no evidence showing Bayan knew that Ghassan possessed the copy. Bayan also asserts that the Government labeled the Murabaha Agreement a "prop" without presenting evidence supporting its contention that Bayan participated in designing it as such. In other words, he contends that the Government produced no evidence, or insufficient evidence, that he executed the Murabaha Agreement as an effort to conceal Marzook's investments in Infocom.[24] Bayan acknowledges that he signed checks and conducted

---

[24]At the February 1, 2006 hearing, Bayan made reference to a 1993 New York Times article, published before the Murabaha Agreement was executed, which publically identified Marzook as a leader in Hamas. Bayan contended that a reasonable jury could not infer that he, Nadia, and Marzook decided to execute the Murabaha Agreement in reaction to the publication of the article, since the Government presented no evidence showing that Bayan had read, or otherwise knew about, the article. The article, which was Government's Exhibit 33B, was not admitted into evidence.

wire transfers to Nadia. He contends, however, that since he was unaware of Marzook's designation, evidence that he wrote checks and conducted wire transfers, even after August 29, 1995, the date Marzook received a terrorist designation, is legally insufficient to establish that he knew these transactions were illegal, or that he had an otherwise bad purpose for conducting them, and therefore is inadequate to show he acted willfully.[25]

The Government contends that a reasonable jury can, and did, conclude that Bayan willfully dealt in the property of a Specially Designated Terrorist based upon the evidence presented during trial showing the actions that Bayan performed as President of Infocom. It presented evidence during trial that Bayan signed the Murabaha Agreement on behalf of Infocom and was the signatory for Infocom's bank accounts, and also produced numerous checks and wire transfer receipts - all to support its contention that Bayan was familiar with Infocom's financial operations. Evidence included a check from Infocom made payable to Marzook, signed by Bayan, which issued approximately 10 weeks before the Murabaha Agreement was executed (Govt's Ex. 11A-9), and numerous checks and receipts from wire transfers issued to Nadia after the Agreement was executed. Although the court agrees with Bayan that the Government produced little evidence as to what spurred Bayan, Nadia, and Marzook to execute the Murabaha Agreement, the court determines that sufficient evidence was presented for a reasonable jury to infer that Bayan knew Marzook was

---

[25]Alternatively, Bayan asserts that the Murabaha Agreement effected an assignment as understood under Islamic law, even if the Agreement did not make an assignment as understood in American jurisprudence. The Agreement provides, "[i]n case of any dispute related to this agreement, then the Islamic laws related to fund investment shall be the reference for judgment." Govt's Ex. 18 at 3. No party has addressed which choice of law rules the court should apply, or whether the choice of law provision contained in the Agreement violates a fundamental public policy of the State of Texas. Similarly, no Defendant, including Bayan, presented evidence during trial of the applicable Islamic laws related to fund investment. Even if particular Islamic laws govern the Agreement, no evidence was presented at trial showing whether the Agreement effected an assignment under Islamic law. The jury was free to choose among reasonable constructions of the evidence, and there was sufficient evidence in the record for the jury to determine that the agreement did not constitute an assignment. *See supra* notes 13, 19.

**Memorandum Opinion and Order - Page 39**

designated as a Specially Designated Terrorist, and that he willfully dealt in property in which he knew Marzook had an interest, and did so knowing it was unlawful.

The court agrees with the Government that a reasonable jury could assign significant weight to evidence showing Bayan's involvement in the financial operations of Infocom, a family-owned and operated company. During trial, the Government presented an Infocom Business Plan containing a flowchart titled "InfoCom's Organizational Structure." *See* Govt's Ex. 27A at 28. The flowchart states that Bayan is "President," and that his responsibilities include "Strategic planning" and "Finance." *Id.* According to the flowchart, Bayan oversees Ghassan, whose job function is "Marketing," and Basman, whose job function is "Operations." *Id.* In addition, Special Agent Miranda testified that agents found the Elbarrasse letter, addressed to Ghassan, in a safe contained in Bayan's office. In light of this evidence, a jury could reasonably infer that Bayan maintained sufficient contact with Ghassan and was aware of his activities, including that he attended a meeting at OFAC and possessed a copy of Executive Order 12947 in his office.

Moreover, FISA cuts, besides those admitted for a limited purpose as to Ghassan, evidenced conversations between Ghassan and Nadia, taking place after the date of Marzook's designation, concerning payments she was to receive from Infocom. *See, e.g.*, Govt's Ex. 25B-C. A reasonable jury could choose to disbelieve Bayan's argument that, although Ghassan kept in contact with Nadia concerning payments from Infocom, Bayan, who wrote the checks and conducted the wire transfers, was left in the dark about why payments were being sent to Nadia, or whom they actually benefited. Similarly, in light of the evidence presented showing the investment history between Marzook and Infocom and any predecessor, a reasonable jury could conclude that Bayan signed the Murabaha Agreement knowing the document was an effort to conceal Marzook's investments in Infocom.

Finally, whether a president of a company would sign an agreement or authorize payments, without knowing the effect of his or her action, is an issue which falls exclusively within the province of the jury.  Such a determination is made by considering the evidence, determining credibility, making reasonable inferences, and applying common sense and reason.

Although Marzook was not designated as a terrorist when Infocom was served with the July 1995 subpoena, a reasonable jury could infer that  Infocom's response to the subpoena would have placed Bayan on notice as to Marzook's arrest and eventual status as a Specially Designated Terrorist.  In addition, a reasonable jury could infer from the September 24, 2001 letter, sent by McColl in response to the OFAC Blocking Notice, that Bayan dealt in property in which Marzook had an interest, knowing it was unlawful.  In relevant portion, the letter stated:

> From the first indication in 1995 of Mr. Marzook's activities, the federal government, itself, has never treated Nadia and her husband, Mr. Marzook as one and the same in any way.  For example, the Government did not freeze Nadia's bank account, only Marzook's . . . .  Infocom assumed that dealing with Nadia was therefore different than dealing with Marzook.

Govt's Ex. 34 at 5.  A reasonable jury could infer from this piece of evidence that Bayan, as the President of Infocom, and the person to whom OFAC addressed its Blocking Notice, knew Marzook was a Specially Designated Terrorist, and also knew that Infocom could not lawfully deal in property in which he had an interest.  In light of the totality of the evidence presented at trial, the court determines that a reasonable jury could conclude, beyond a reasonable doubt, that Bayan willfully dealt in the property of a Specially Designated Terrorist.

**b.      Conspiracy to deal in the property of a Specially Designated Terrorist**

**Memorandum Opinion and Order - Page 41**

Bayan advances the same arguments in support of his contention that he should be acquitted of Count 1.  Upon review, the court determines that sufficient evidence was presented during trial for a reasonable jury to find the essential elements of conspiracy to deal in the property of a Specially Designated Terrorist, as alleged in Count 1.

Bayan contends that it would be an improper inference from the evidence presented that he made "affirmative lies" in response to the subpoena served on July 31, 1995.  Apparently, Bayan believed the subpoena requested documents pertaining to Nadia and Marzook collectively, and that it did not request documents pertaining solely to Marzook.  He argues that, when the evidence is viewed from his perspective of what the subpoena requested, that is, documents relating to both Nadia and Marzook, he fully complied with the subpoena.

Based upon the evidence presented at trial, including the testimony of Special Agent Harkins, a reasonable jury could infer that Bayan knowingly failed to disclose all documents pursuant to the subpoena request.  Even if a jury accepted *Bayan's* view at face value, it could nevertheless infer that he made misrepresentations aimed at knowingly preventing disclosure of documents linking Infocom and Marzook.  Most notably, a jury could infer that, even if Bayan truly believed he fully complied with the subpoena by producing only those documents relating to both Nadia and Marzook, he still was untruthful, and intended to mislead Harkins and the other agents, when he stated that Infocom had conducted no transactions with Marzook prior to the execution of the Murabaha Agreement.  Accordingly, a reasonable jury could infer that Bayan's response to the July 1995 subpoena epitomized the conduct of someone orchestrating a cover-up, joined by others, to hide the totality of Infocom's dealings with Marzook.

Turning to the September 24, 2001 letter, Bayan contends that it is unreasonable to conclude, even when viewed in the light most favorable to the Government, that the letter shows he actively participated in concealment, either alone or in concert with Basman and Ghassan.  In support of his assertion that the letter does not evidence conduct as part of or in furtherance of a conspiracy, he reasons that the letter did not "carbon copy" Defendants, and also contends that the Government produced no evidence that he, Basman, or Ghassan participated in drafting, reviewing, or correcting it.  The court determines that a reasonable jury, viewing the letter, which was sent in response to an OFAC Blocking Notice addressed to Bayan as President of Infocom, could easily infer that it essentially reiterates the statements Bayan made in response to the July 1995 subpoena.  It is "the jury's sole province to assess the weight of the evidence," *Molinar-Apodaca*, 889 F.2d at 1423, and it "is free to choose among reasonable constructions of the evidence." *Pennington*, 20 F.3d at 597. In this case, the jury apparently chose to interpret the letter in a manner adverse to Defendants, including Bayan, and the court determines that sufficient evidence supports such decision.  The court concludes, reviewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in support of the verdict, that a reasonably jury could find beyond a reasonable doubt that Bayan was guilty of conspiracy to deal in the property of a Specially Designated Terrorist.

### c.      Money laundering

Turning to Counts 13 through 21, Bayan challenges his money laundering convictions on the ground that the Government failed to present sufficient evidence that he knew the financial transactions he effected were designed to conceal proceeds of unlawful activity.  He contends that, as the Government failed to produce sufficient evidence supporting the inference that the Murabaha

Agreement was a prop or cover designed to conceal Marzook's investments in Infocom, it has also failed to establish that Infocom's monetary payments to Nadia were a natural consequence of such prop.

The evidence presented at trial shows Bayan participated in making over forty financial transactions to Nadia after August 29, 1995, the date Marzook received a terrorist designation.  As stated above, a "particular transaction must be viewed in context when determining whether it was designed to conceal." *Burns*, 162 F.3d at 848.  Regardless of whether Bayan knew whether the Murabaha Agreement was designed to conceal Marzook's investments in Infocom, a reasonable jury could infer from the evidence presented that Bayan was placed on notice of the potential dangers of dealing in property in which Marzook had an interest as of July 31, 1995, when he responded to the subpoena.  The bottom line is that, despite such notice, payments to Nadia continued.  A reasonable jury could infer from the evidence that, since Bayan was the signatory on Infocom's accounts, by issuing checks and wire transfers to Nadia, he engaged in money laundering, or aided and abetted the other Defendants in money laundering.  Evidence that may be considered when determining whether a transaction was designed to conceal includes the following:

> statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*Burns*, 162 F.3d at 848 (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475-76 (10th Cir. 1994)).  In this case, the record reflects that Bayan's statements made in response to the July 1995 subpoena could be considered probative of an intent to conceal.  Likewise, it could be readily interpreted from Bayan's financial involvement in Infocom, both before and after execution of the

Murabaha Agreement, that the Agreement was structured to conceal Marzook's investments in Infocom, and that the payments Infocom made to Nadia after its execution were the result of unusual financial moves, paid to her to conceal the real owner. *See Burns*, 162 F.3d at 848. Accordingly, upon review, the court determines that the evidence presented during trial was sufficient for a reasonable jury to find each essential element of money laundering pursuant to 18 U.S.C. § 1956(a)(1)(B)(i) beyond a reasonable doubt.

### d.        Conspiracy to commit money laundering

The court determines that there was sufficient evidence presented during trial to satisfy the Government's burden of proof as to Count 12. A rational jury could conclude that the totality of the evidence established the essential elements of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), beyond a reasonable doubt. The court is convinced that the jury made a conclusion based upon the evidence presented and the credibility of the witnesses.

### e.        Conclusion regarding Bayan's motion

Upon reviewing the evidence presented in the light most favorable to the Government and drawing all reasonable inferences in support of the verdict, the court determines that a rational jury could find beyond a reasonable doubt that the Government established the essential elements of (1) conspiracy to deal in the property of a Specially Designated Terrorist; (2) dealing in the property of a Specially Designated Terrorist; (3) conspiracy to commit money laundering; and (4) money laundering. Accordingly, Defendants' Motion Reurging Motion for Judgment of Acquittal Pursuant to Rule 29, Federal Rules of Criminal Procedure and Motion Adopting Other Defendants' Motions, insofar as the motion pertains to Defendant Bayan Elashi, should be denied.

## 2.      Infocom Corporation

A corporation does not possess a mental state. *Investment Enters.*, *Inc*., 10 F.3d at 266.  A corporation is criminally liable, however, "for the unlawful acts of its agents, provided that such conduct is within the scope of the agent's authority, actual or apparent." *United States v. Bi-Co Pavers*, *Inc*., 741 F.2d 730, 737 (5th Cir. 1984) (citations omitted). Hence, while Infocom cannot possess the requisite intent to commit the offenses alleged in the revised superseding indictment, its agents - Bayan Elashi, Ghassan Elashi, and Basman Elashi, and particularly Bayan, as President of Infocom - can.  *See Investment Enters*, *Inc*., 10 F.3d at 266.  There is ample evidence in the record to support a conclusion that each element of each offense against Infocom was committed by one or more of its agents; that the agents, in committing these acts, did so intending, at least in part, to benefit the corporation; and that each act was within the scope of employment of the agent who committed it.

Bayan, the signatory of Infocom's bank accounts, wrote the checks and conducted the wire transfers at issue on behalf of Infocom.  Bayan, as President of Infocom, made statements to federal agents in response to the July 1995 subpoena, and also signed the Form FD-597 inventory list prepared in response to the subpoena.  In addition, the OFAC Blocking Notice, which triggered the September 24, 2001 letter, was addressed to Bayan, as President of Infocom.  It may reasonably be inferred that Bayan committed the conduct at issue intending, at least in part, to benefit Infocom, and that he committed the acts within the scope of his employment.  Accordingly, Defendants' Motion Reurging Motion for Judgment of Acquittal Pursuant to Rule 29, Federal Rules of Criminal Procedure and Motion Adopting Other Defendants' Motions, insofar as the motion pertains to Defendant Infocom Corporation, should be denied.

## V.    <u>Miscellaneous</u>

Each Defendant has challenged whether he or it "willfully" dealt in the property of a Specially Designated Terrorist, pursuant to Executive Order 12947 and the IEEPA, by assuming that the term "interest," when used with respect to property covered by the Executive Order, as enforced by the IEEPA, is restricted to property in which a Specially Designated Terrorist has a tangible interest.  In other words, Defendants generally have acknowledged that Marzook technically retained an attenuated or indirect interest in the transactions that Infocom made to Nadia simply because Nadia is his spouse; they claim, however, that such interest is not the type contemplated by Executive Order 12947 and the IEEPA.  The court disagrees.

Courts have not addressed the meaning of "interests in property" as it specifically relates to Executive Order 12947 and 31 CFR § 595.201(a).  Several courts, however, have addressed the meaning of "any interest" as used in 50 U.S.C. § 1702(a)(1)(B), the portion of the IEEPA governing the types of property that the President may block.  *See Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F.Supp.2d 57, 67 (D.D.C. 2002) (holding the IEEPA does not limit blocking authority to the existence of a legally enforceable interest),[26] *aff'd*, 333 F.3d 156 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 1218 (2004); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) ("[T]he focus must be on how assets could be controlled and used, not on bare legal ownership ."), *cert. denied*, 540 U.S. 1003 (2003); *Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir.) ("The IEEPA grants the President sweeping powers . . . ."), *cert. denied*, 528 U.S. 928 (1999).

---

[26]The court in *Holy Land Found. For Relief & Dev.*, 219 F.Supp.2d at 67, interpreting 50 U.S.C. § 1702(a)(1)(B), held that the "plain text of the IEEPA authorizes the blocking of property in which the designated foreign national or country has 'any interest' . . . . The language imposes no constraints on that term."

**Memorandum Opinion and Order - Page 47**

In Executive Order 12947, the President made clear that "all property and interests in property" of specially designated persons "that are in the United States . . . are blocked," Exec. Order 12947 § 1(a)(iii), 60 Fed. Reg. 5079, and that "any transaction or dealing by United States persons or within the United States in property or interests in property of the persons designated in or pursuant to this order is prohibited . . . ." *Id.* §1(b).  Congress explicitly authorized the executive branch to promulgate regulations, "including regulations prescribing definitions," as may be necessary to exercise the President's authority under the IEEPA.  *See* 50 U.S.C. § 1704; *Paradissiotis*, 171 F.3d at 988.  The Secretary of the Treasury, through OFAC, promulgated a regulation defining "interest," including "an interest in property," to mean "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 595.307.  Given the plain text of the Executive Order, the clear directive of its concomitant regulations, and case authority indicating that the President's blocking authority is not restricted to legally enforceable interests, this court determines that the term "interests in property," as used with respect to property in Executive Order 12947, is to be construed broadly.

To the extent that Defendants Ghassan, Basman, and Bayan Elashi reason that they did not deal in the property of a Specially Designated Terrorist because the transactions they conducted did not involve an interest in property subject to Executive Order 12947, the court disagrees.  Marzook's interest in payments made by Infocom to Nadia, his wife, is an interest in property falling under the ambit of Executive Order 12947.  *Cf.* 31 C.F.R. § 595.307; *Holy Land Found. For Relief & Dev.*, 219 F.Supp.2d at 67; *Paradissiotis*, 171 F.3d at 988.  There is ample evidence in the record to establish that Marzook retained an interest in the $250,000 invested in Infocom pursuant to the Murabaha Agreement, as well as in the payments made by Infocom to Nadia in the years after its

execution, including payments made after August 29, 1995, when OFAC designated Marzook as a Specially Designated Terrorist. One of the strongest pieces of evidence was a statement made by Basman. Special Agent Lewis testified during trial that when he interviewed Basman at his residence on the morning of September 5, 2001, Basman stated that the money invested in Infocom pursuant to the Murabaha Agreement belonged to both Nadia and Marzook because they are married.[27] A jury could reasonably infer from Basman's statement that Marzook never divested himself of his interest in the $250,000 invested in Infocom pursuant to the Agreement, and therefore retained an interest in any payments that Infocom made to Nadia pursuant to the Agreement. Moreover, FISA cuts, in addition to those admitted only as to Ghassan, evidenced conversations between Marzook and Tariq that discussed whether Ghassan had sent monies and papers (Govt's Ex. Nos. 38B, 38C, 38H). A jury could reasonably infer from these cuts that, in addition to being concerned about his family, Marzook retained an interest in the monies invested into Infocom or the proceeds from such property.

## VI.   Conclusion

For the reasons herein stated, the court **determines**, after reviewing the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices made in support of the jury verdict, that sufficient evidence existed for a reasonable jury to convict each Defendant beyond a reasonable doubt on each count of conviction.[28] Accordingly, the court

---

[27]Although Basman made the statement to Special Agent Lewis after the date the conspiracies ended, as alleged in the revised superseding indictment, the court determines, for the reasons set forth *supra* in notes 16 and 20, that Basman's statement is highly probative of whether Defendants knew that they were dealing in the property of a Specially Designated Terrorist.

[28]At various times during the course of this case, Defendants have asserted or intimated that they have been "singled out" or selectively prosecuted because they could have received a civil penalty, in lieu of being criminally prosecuted, pursuant to 50 U.S.C. § 1705. This statute, at the times relevant herein, provides:

**Memorandum Opinion and Order - Page 49**

**denies** Defendant Ghassan Elashi's Rule 29(c) Renewal of Motion of Judgment of Acquittal; **denies**

Defendant Basman Elashi's Motion for Judgment of Acquittal Pursuant to Rule 29, Federal Rules

of Criminal Procedure; **denies** Defendant Basman Elashi's Motion for New Trial Pursuant to Rule

33, Federal Rules of Criminal Procedure; and **denies** Defendants' Motion Reurging Motion for

Judgment of Acquittal Pursuant to Rule 29, Federal Rules of Criminal Procedure and Motion

Adopting Other Defendants' Motions, filed by Defendants Bayan Elashi and Infocom Corporation.

A sentencing schedule for the Defendants will issue by separate document.

　　　　**It is so ordered** this 12th day of July, 2006.

　　　　　　　　　　　　　　　　　　　　_Sam A. Lindsay_
　　　　　　　　　　　　　　　　　　　　Sam A. Lindsay
　　　　　　　　　　　　　　　　　　　　United States District Judge

---

　　　　(a)  A civil penalty of not to exceed $10,000 may be imposed on any person who violates, or attempts
　　　　to violate, any license, order, or regulation issued under this chapter.
　　　　(b)  Whoever willfully violates, or willfully attempts to violate, any license, order or regulation issued
　　　　under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may
　　　　be imprisoned for not more than ten years, or both . . . .

50 U.S.C. § 1705(a)-(b).  While the court agrees that the Government could have proceeded against Defendants by way
of civil penalties, the IEEPA allows the Government to seek criminal prosecution.  *See* 50 U.S.C. § 1705(b).  "So long
as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision,
whether or not to prosecute, and what charge to file . . . generally rests entirely in his discretion."  *In re United States*,
397 F.3d 274, 284 (5th Cir. 2005) (quotation omitted).  Also, Defendants seem to intimate at times that the Government
sought to prosecute them because of their race, religion, or national origin.  The exercise of prosecutorial discretion is
limited by the Equal Protection Clause, and "consideration of an Equal Protection-based claim of selective prosecution
necessarily begins with a presumption of good faith and constitutional compliance by the prosecutors."  *Id.* (citation
omitted).  To overcome the presumption, a defendant "must prove both discriminatory effect and discriminatory purpose
by presenting clear evidence."  *Id.* (citation and quotation omitted).  That the Government elected to pursue criminal
prosecution in this case is not enough to establish that Defendants were prosecuted for some impermissible reason, such
as race, religion, or national origin.  There has been no showing that the Government's decision to prosecute was
motivated by a discriminatory purpose, or that it produced a discriminatory effect.  Moreover, selective prosecution
challenges the prosecution itself, and is not a defense to the crime or offense alleged.  *United States v. Armstrong*, 517
U.S. 456, 463 (1996).

**Memorandum Opinion and Order - Page 50**